Lavonda MOREHOUSE,
Plaintiff/Appellant,

v.

BEHLMANN PONTIAC–GMC
TRUCK SERVICE, INC.

and

Universal Underwriters Service
Corporation, Defendant/Respondent.

No. ED 76556.

Missouri Court of Appeals,
Eastern District,
Division One.

Aug. 8, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 4, 2000.

Application for Transfer Denied
Dec. 5, 2000.

John R. Birkby, St. Louis, for appellant.

Lawrence J. Permuter, Ellen K. Siegel, Thomas B. Weaver, Armstrong, Teasdale LLP, ·Cynthia A.·· Sciuto, St. Louis, for respondent.

## OPINION

JAMES R. DOWD, Judge.

LaVonda Morehouse (hereinafter "Morehouse") appeals from a judgment di-recting verdicts in favor of Behlmann Pontiac–GMC Truck Service, Inc. (hereinafter "Behlmann") and Universal Underwriters Service Corporation (hereinafter "Universal"). We reverse in part, affirm in part, and remand.

### Standard of Review

■ In reviewing a directed verdict granted in favor of a defendant, the appellate court views the evidence and permissible inferences most favorably to the plaintiff, disregards contrary evidence and inferences, and determines whether plaintiff made a submissible case. *Head v. National Super Markets*, 902 S.W.2d 305, 306 (Mo.App. E.D.1995). Directing a verdict is a drastic remedy. *Id.* We will reverse the trial court's grant of a directed verdict unless the facts and any inferences therefrom are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to a result. *Id.*

### Facts

The evidence viewed most favorable to Morehouse is as follows. On September 3, 1994, Morehouse and her mother, Dorothy Williams, went to the Behlmann dealership to look at used cars. Ed Bogosian (hereinafter "Bogosian"), a Behlmann salesperson with forty-two years of experience selling vehicles, offered to help Morehouse. Morehouse told him that she was looking for a reliable and lasting van priced around ten or twelve thousand dollars. Bogosian told her that he had years of experience selling vehicles and that he knew what was good.

After looking at several vehicles, Morehouse focused on a Cheverolet Astro minivan because it had less than 100,000 miles and the color appealed to her. Bogosian told her that the minivan was in excellent condition, had been well maintained, and that it would be reliable.

Following this conversation, Morehouse and her mother test drove the minivan. Morehouse noticed a "jerking of the engine" and the brake pedal pressing almost

to the floor. Her mother thought that the engine felt sluggish. After the test drive, Morehouse advised Bogosian of these complaints. Bogosian replied that the vehicle was in good condition but agreed to go with Morehouse on a second test drive. Bogosian said that he could not feel or hear anything wrong with the engine and that the roughness was standard. He also said that since a minivan drives more like a truck than a car and she was not used to driving a truck, she should not be concerned about the roughness of the engine.

After speaking with a service mechanic, Bogosian reiterated to Morehouse that everything was fine. Morehouse responded that she wanted the minivan in excellent condition so that she would not have to keep bringing it back for repairs. Bogosian sent the mechanic for a test drive, and the mechanic also said that he did not feel anything wrong.

That day, Morehouse signed a contract to buy the minivan for $10,300, including a $500 down payment. She paid the $500 and promised to pay the remaining $9,800 in cash by September 16th. Because Morehouse did not receive the money she anticipated by that date, she and Bogosian agreed over the telephone on a new purchase date of November 4, 1994.

On October 12, 1994, Behlmann sent the minivan to Tony's Auto Repair to fix an overheating problem. On August 18, 1994, Tony's Auto Repair had also changed the minivan's oil and filter, replaced the front brakes and the gas cap, and cleaned the fuel system.

When Morehouse arrived with her mother on November 4, 1994 to pick up the vehicle, Bogosian told her that she had almost lost the minivan to another customer. The second customer, however, had refused to purchase the vehicle because the radiator exploded when he turned the ignition. Bogosian also informed Morehouse that because of the cost of repairs, the purchase price of the car had been increased by $400. Bogosian and Morehouse settled on an increase of $100.

On Bogosian's suggestion, Morehouse then spoke with Jane Harlow (hereinafter "Harlow"), Behlmann's finance manager. Harlow sold Morehouse a two-year, 24,000 mile comprehensive warranty issued by Universal for $1,456. The warranty obligated Universal to "repair or replace any part necessary to remedy a[m]echanical [b]reakdown and cover the cost of related labor, or pay an authorized repair facility customary and reasonable charges to do so, less the deductible displayed in the declarations section" (emphasis omitted).

Over the time that she possessed the minivan, Morehouse returned it to Behlmann a total of five times with a multitude of complaints each time. One recurring complaint was that the engine was overheating. Behlmann made or attempted to make repairs to address some of Morehouse's complaints but did not attempt to repair problems that it could not replicate in the shop. Although Universal covered the bulk of the repair costs, on two occasions, Morehouse paid the deductible called for in the warranty.

On April 18, 1996, while Morehouse was driving the minivan on the highway, the engine shut down and would not restart. Morehouse had the vehicle towed to Behlmann that same day. Behlmann and Universal eventually informed Morehouse that the minivan would not be repaired because she had not changed the oil and filter. On May 20, 1996, Morehouse returned the rental car she had been driving and paid the $349.14 balance for the use of the vehicle beyond the eleven days covered by the warranty. On July 9, 1997, fifteen months after Morehouse had the minivan towed to Behlmann, the insurance adjuster for Behlmann and Universal informed Morehouse that it was denying any voluntary payment of her claim.

Numerous witnesses testified at trial that the minivan's oil and filter had been changed eight times while in Morehouse's possession: in January, March, May, July, August and October of 1995 and in Janu-

ary of 1996. Morehouse also presented invoices from New Age Car Care for two of these oil changes.

Morehouse sued Behlmann for common law fraud and unfair merchandising practices, alleging that Behlmann induced her to buy the minivan through unlawful merchandising practices and fraudulent representations. She sued Behlmann and Universal for breach of contract, alleging that Universal breached its service contract by refusing to pay for the van's repairs. At the conclusion of Morehouse's evidence, Behlmann and Universal moved for directed verdicts. The trial court sustained these motions. Morehouse appeals.

### Analysis

Morehouse presents several points of error on appeal. First, she claims that the trial court erred in finding that Bogosian's statements that the minivan was in excellent condition was a matter of opinion and not a specific representation of fact. Second, Morehouse contends that the trial court erred in sustaining Behlmann's objection to the admission of the title history of the vehicle. Third, she claims that the trial court erred in finding that she failed to submit evidence on damages on all three claims. Fourth, Morehouse claims that the trial court erred in finding that she failed to make a submissible case on her claim that the warranty covered the minivan's engine failure.

### I. Bogosian's Statements

Morehouse's suit against Behlmann raised claims of common law fraud and violations of the Merchandising Practices Act. The trial court directed a verdict in favor of Behlmann on both counts because it found that Bogosian's statements were merely expressions of opinion and not material representations of fact. Bogosian told Morehouse several times that the minivan was in excellent condition, was in tip-top shape, had been well-maintained, and that there was nothing wrong with it.

A seller may puff his wares or express his opinion as to the quality and value of his goods even to the point of exaggeration without incurring a warranty obligation. *Guess v. Lorenz*, 612 S.W.2d 831, 833 (Mo.App. E.D.1981). Conversely, if the representation is a statement of fact, a petition alleging such a representation may sufficiently state a claim for breach of express warranty or fraudulent misrepresentation. *Carpenter v. Chrysler*, 853 S.W.2d 346, 358 (Mo.App. E.D.1993). A given representation can be an expression of opinion or a statement of fact depending upon the circumstances surrounding the representation. *Clark v. Olson*, 726 S.W.2d 718, 720 (Mo.banc 1987).

In *Carpenter v. Chrysler Corp.*, a salesman told a customer that a car was "a good car, reliable, brand new. This might be what you're looking for. This is the kind of car to have." *Carpenter*, 853 S.W.2d at 358. In fact, the dealer had repaired a leak in the power steering system and the car had been subject to a recall. We held that the salesman's statements to the customer were statements of fact. *Id.*

Similarly, here Bogosian represented to Morehouse that the minivan was "in excellent condition," "in good condition," "in tip-top shape" and would be "reliable." Also as in *Chrysler*, the salesperson here referred specifically to the minivan in attesting to its soundness and reliability. *Id.* As we held in *Chrysler*, these statements conveyed sufficient definite information about the quality of the vehicle for that representation to be considered material. They are not merely statements of opinion.

Behlmann argues that the present case is distinguishable because of the power steering system repair and the recall in *Chrysler*. However, those facts are irrelevant in determining if the statement to the customer is one of opinion or a representation of fact. Instead, they tend to prove the actual condition of the car and the dealer's knowledge of that condition. In

our case, by directing the verdict on the grounds that Bogosian did not make a representation of fact, the trial court prevented the jury from reaching those questions. The power system steering repair and the recall in *Chrysler* do not distinguish that case from the present one. In *Chrysler*, the evidence established that the dealer knew about the actual condition of the vehicle. Here, the evidence established that Bogosian assured Morehouse that the vehicle was in excellent condition when he, at best, had no knowledge as to whether his statements were true or false.

■ In *Grabinski v. Blue Springs Ford Sales, Inc.*, an automobile dealership employee told a customer that a car was "very nice," was "driving fine" and "only needed a clean-up and standard service." *Grabinski v. Blue Springs Ford Sales, Inc.*, 136 F.3d 565, 567 (8th Cir.1998). The Eighth Circuit held that these statements likewise were representations of fact. *Id.* at 569. Behlmann attempts to distinguish *Grabinski* from the present case because the Eighth Circuit held that the dealership knew or should have known that the car had been in a wreck and had power problems. *Id.* Again, what the dealership knew or should have known has no bearing on whether a statement to a customer is an opinion or a representation of fact.

Behlmann also contends that the present case is distinguishable because the dealership employee in *Grabinski* stated that the car only needed a clean-up and standard service. We fail to understand how that additional sentence renders the *Grabinski* statement a representation of fact. It merely reiterates the representation that the car was "very nice" and "driving fine." The *Grabinski* statements are virtually identical in character to the statements in the present case. Both convey sufficient definite information about the quality of the vehicle.

Conversely, in *Guess v. Lorenz*, we held that an automobile seller's statements that the car was "in good shape" and that a noise in the rear end of the vehicle "was just something the car does" were expressions of opinion. *Guess v. Lorenz*, 612 S.W.2d at 833. An integral part of that holding, however, was that the buyer and the seller were on equal footing in terms of knowledge of car mechanics and the seller gave no impression of knowledge about cars. *Id.* In the present case, Morehouse told Bogosian several times that she was an inexperienced car buyer and that she had no idea what to look for in a car. Bogosian responded that he had years of experience selling cars and knew what was good. Given Bogosian's advantage in experience and his representation thereof, his statements to Morehouse about the condition of the car conveyed sufficient information to be representations of fact, and not merely statements of opinion. We hold that Bogosian's statements to Morehouse were actionable representations of fact. Point granted.

## II. The Title History of the Minivan

■ Morehouse next argues that the trial court erred in sustaining Behlmann's objection to the introduction into evidence of the minivan's title history. We accord decisions of the trial court as to the admissibility of evidence substantial deference and do not disturb these decisions absent a showing of abuse of discretion. *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo.banc 1991). The test for relevancy is whether an offered fact tends to prove or disprove a fact in issue or corroborates other relevant evidence. *Id.*

At trial, Morehouse attempted to introduce the title history to show that despite Bogosian's statement that the minivan had only one prior owner, the vehicle actually had multiple prior owners. The trial court excluded this evidence because it found that it was outside the scope of Morehouse's petition. In explaining its ruling, the court stated:

> The material representation that you plead, however, is that it was in excellent condition.

. . .

. . . The fact that it's been previously owned a certain number of times does not prove or disprove that it was in excellent condition.

. . .

I think the fact that it was owned, or how many people owned it, doesn't necessarily prove or disprove anything.

■ The trial court abused its discretion in refusing to admit the title history of the minivan. The test of relevancy of evidence is not whether the evidence *necessarily* proves or disproves a fact in issue, but whether it *tends* to prove or disprove such a fact. *Oldaker, supra.* In that pursuit, the trial court must give weight to the inference most favorable to the party offering the evidence.

■ Here, Morehouse attempted to prove, among other things, that Bogosian represented to her that the minivan was in excellent condition, that the minivan was not in excellent condition, and that Bogosian knew or should have known the minivan was not in excellent condition. The title history of the vehicle would tend to prove the actual condition of the vehicle. According to our standard of review, we must view the evidence and permissible inferences most favorably to the plaintiff and disregard contrary evidence and inferences. *Head v. National Super Markets,* 902 S.W.2d at 306. Had this evidence been admitted, the jury could have inferred that the car was sold numerous times because its various owners continued to find problems with it. A jury could have used that inference to conclude that a car with multiple prior owners is less likely to be in excellent condition than a car with only one prior owner. Just because this inference is not the only inference possible is not a sufficient reason to exclude it from evidence.

Behlmann contends that the refusal to admit the title history into evidence does not constitute reversible error because it would not have changed the result reached. It cites *Green v. Stanfill,* 641 S.W.2d 490, 492 (Mo.App. S.D.1982), and argues that because the trial court directed the verdict in favor of Behlmann, the admission of the title history could not have changed the result. The *Green* rule is logically inapplicable here, however, because we are reversing the directed verdict in favor of Behlmann. The inability of the evidence to affect the outcome is irrelevant when the case is to be retried on other grounds.

In excluding the minivan's title history from evidence, the trial court abused its discretion as set forth in *Oldaker, supra.* Point granted.

III. Morehouse's Failure to Prove Damages

■ In fraud cases, the courts of this state are committed to the benefit of the bargain rule as a method of arriving at damages. *Heberer v. Shell Oil Co.,* 744 S.W.2d 441, 443 (Mo.banc 1988). Applied to a transaction involving the sale of an automobile, it allows the defrauded party to be awarded the difference between the actual value of the property and what its value would have been if it had been as represented. *Auffenberg v. Hafley,* 457 S.W.2d 929, 937 (Mo.App.1970). Applying that rule to the present case, Morehouse, if successful in her claim, would be entitled to the difference in the value of the van as represented by Behlmann and the actual value of the van when she purchased it.

■ The value of the minivan as represented on the date of sale was its sale price of $10,400. Morehouse, however, failed to present evidence of the actual value of the minivan on the date of purchase even though Morehouse or David Dyer, her expert witness, could have testified to that. *See Auffenberg,* 457 S.W.2d at 937 *and Grabinski,* 136 F.3d at 570. Neither did so.

Morehouse, however, did present evidence of damages that is not dependent on the value of the minivan. Morehouse pre-

sented several repair invoices into evidence. These invoices showed that she paid a $75 deductible on two different occasions and the rental car cost of $349.14. Had the minivan been as Behlmann represented it, Morehouse would not have had to incur those costs. Morehouse's oversight in failing to prove the vehicle's actual value does not eliminate this evidence of actual damages caused by Behlmann's alleged misrepresentation.

Morehouse proved sufficient damages to submit to the jury the common law fraud and Merchandising Practices Act claims. Point granted.

## IV. The Breach of Contract Claim

■ Morehouse contends that the trial court erred in finding for Universal because she failed to make a submissible case that the engine failure was covered by the warranty. The warranty obligated Universal to "repair or replace any part necessary to remedy a mechanical breakdown and cover the cost of related labor" (emphasis omitted). "Mechanical breakdown" is defined in the policy as the "failure of a covered part because of a mechanical defect or faulty workmanship by the manufacturer which renders the covered part incapable of performing the function for which it was designed" (emphasis omitted).

Mr. Dyer testified that the failure of the engine was caused by oil turning into sludge and thereby becoming incapable of lubricating the engine. When asked what can cause the oil to turn to sludge, he stated "[n]ot changing [the oil] is about the only way you can get sludge in [the engine]. Or extreme heat."

Morehouse thereby submitted evidence that the engine failure was caused by oil sludge, which in turn was caused by either a failure to change the oil or extreme heat. Morehouse also submitted evidence that she had the oil and filter changed seven times in the seventeen months in which the minivan had been driven 23,000 miles. Viewing the evidence and inferences most favorable to Morehouse, as our standard of review compels us, Morehouse submitted evidence eliminating the failure to change the oil as a cause for the oil sludge and leaving extreme heat as a possible cause for the engine's breakdown. This evidence is bolstered by Morehouse's continuing complaint to Behlmann that the engine was running hot. It is also supported by the evidence that Tony's Auto Repair worked on the vehicle to fix an overheating problem before Morehouse took possession of it.

Had the jury been permitted to do so, it could have reasonably concluded that the oil sludge was caused by extreme heat which in turn could have been caused by a failure of a covered part because of a mechanical defect or faulty workmanship. Morehouse submitted sufficient evidence that the engine's failure was covered by the warranty. The trial court erred in finding otherwise. Point granted.

■ Morehouse also argues that the trial court erred in finding that she failed to submit evidence of damages on the breach of contract claim. Damages for breach of contract are also measured by the benefit of the bargain rule. *Dierkes v. Blue Cross and Blue Shield of Missouri*, 991 S.W.2d 662, 669 (Mo.1999). In the breach of contract setting, damages are the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented. *Boten v. Brecklein*, 452 S.W.2d 86, 93 (Mo.1970). Compensation is the value of the performance of the contract. The person injured is to be placed in the position she would have been in had the contract been performed. *Id.* In our case, Morehouse is claiming that Universal and Behlmann breached the warranty contract by failing to repair the vehicle once the engine seized. Consequently, to establish damages under the benefit of the bargain rule, a plaintiff should present evidence showing the difference between the value of the vehicle with the damaged part and

the cost of replacing that part. Morehouse failed to present any evidence of this kind.

■ Morehouse, however, did submit evidence that she incurred losses as a direct result of Universal's breach of contract. After the minivan's engine seized, Morehouse rented a car from Behlmann. Pursuant to the warranty, Universal covered the cost of the rental car for eleven days. Morehouse paid $349.14 for the use of the car beyond the eleven days covered by the warranty. It can be inferred that if Universal had paid for the minivan's repair, Morehouse would not have needed to rent the vehicle beyond those eleven days. The value of performance of the warranty contract, therefore, includes Morehouse's incurred rental car costs. Therefore, Morehouse submitted evidence of actual damages caused by Universal's alleged breach of contract, and the trial court erred in finding otherwise.

■ Ordinarily, in contract cases, proof of the contract and its breach gives rise to nominal damages and, thus, a submissible case is made regardless of the failure to prove actual damages. *Gee v. Payne*, 939 S.W.2d 383, 387 (Mo.App. W.D.1997). Morehouse, however, failed to raise this issue on appeal, so we decline to reach it.

The trial court erred in finding that Morehouse failed to make a submissible case against Universal on the breach of contract claim. Point granted.

## V. The Breach of Contract Claim Against Behlmann

■ Morehouse contends that the trial court erred in sustaining Behlmann's motion for a directed verdict with regard to the breach of contract claim. Rule 78.07 requires that all allegations of trial error must be raised in a motion for new trial to be preserved for appellate review. Rule 78.07; *Webb v. Missouri Highway and Transp. Co.*, 947 S.W.2d 490, 491 (Mo.App. E.D.1997). Rule 78.07 is applicable when directed verdicts are entered in jury-tried cases. *Brouk v. Brueggeate*, 849 S.W.2d 699, 702 (Mo.App. E.D.1993). An erroneously directed verdict is an error which must be raised in a motion for new trial to be preserved for appellate review. *Id.*

■ In this case, the trial court sustained both Universal's and Behlmann's motion for a directed verdict on the breach of contract claim. In her motion for new trial, however, Morehouse alleged that the trial court erred in sustaining Universal's motion for a directed verdict on the breach of contract claim but did not allege that the trial court erred in sustaining Behlmann's motion for a directed verdict on the breach of contract claim. Therefore, this issue is not preserved for appellate review.

### Conclusion

The portion of the trial court's order sustaining Behlmann's motion for directed verdict on the common law fraud claim and the Merchandising Practices Act claim is reversed. The portion of the order sustaining Universal's motions for directed verdict on the breach of contract claim is also reversed. The portion of the order sustaining Behlmann's motion for a directed verdict on the breach of contract claim is affirmed. This case is remanded for further proceedings consistent with this opinion.

GARY M. GAERTNER, P.J. and PAUL J. SIMON, J., concur.